## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| JKSOFT, INC., a California corporation, <br><br> *Plaintiff,* <br><br> v. <br><br> INNOAS, INC., a New Jersey corporation, SEUNG JAI YI a/k/a NOAH LEE, and John Does 1-20, being fictitious names presently unknown to the Plaintiff and ABC Corporations 21-40, being fictitious names presently unknown to Plaintiff, <br><br> *Defendants.* | Case No.: 2:18-cv-00199 (WJM) (MF) <br><br> <u>CIVIL ACTION</u> |
| INNOAS, INC., a New Jersey corporation, and NOAH LEE, <br><br> *Counter-claimants,* <br><br> v. <br><br> JKSOFT, INC., a California corporation, <br><br> *Counter-defendant.* | **ANSWER, COUNTERCLAIMS, THIRD PARTY COMPLAINT, AND DEMAND FOR JURY TRIAL** |
| INNOAS, INC., a New Jersey corporation, and NOAH LEE, <br><br> *Third-party plaintiffs,* <br><br> v. <br><br> JAE HOON ("BRIAN") KANG; XYZ CORPS. 1 through 10 (fictitious); and JOHN/JANE DOES 1 through 10 (fictitious); <br><br> *Third-party defendants.* | |

Defendants, INNOAS, INC. ("Innoas") and NOAH LEE ("Lee"), by and through its attorneys, Kim, Cho & Lim, LLC, upon personal knowledge as to themselves, and upon information and belief as to other matters, answer the complaint and allege as follows:

## INTRODUCTION

1.      Admit only that Plaintiff alleges claims for copyright infringement, contributory copyright infringement, common law trademark infringement, violation of the Computer Fraud and Abuse Act (CFAA), violation of the Digital Millennium Copyright Ace ("DMCA"), violation of the Federal Defense of Trade Secret Act ("DTSA"), unfair competition, and permanent injunction. Except as expressly admitted, Defendants deny the allegations set forth in paragraph 1 of the complaint.

2.      Deny the allegations in paragraph 2 of the complaint.

3.      Deny the allegations in paragraph 3 of the complaint.

4.      Deny the allegations in paragraph 4 of the complaint.

5.      Deny the allegations in paragraph 5 of the complaint.

6.      Deny the allegations in paragraph 6 of the complaint.

7.      Deny the allegations in paragraph 7 of the complaint.

8.      Deny the allegations in paragraph 8 of the complaint.

## THE PARTIES

9.      Admit the allegations in paragraph 9 of the complaint.

10.     Admit the allegations in paragraph 10 of the complaint.

11.     Admit the allegations in paragraph 11 of the complaint. Defendant Noah Lee's legal name is "Noah Lee" with former legal name "Seung Jai Yi" and also formerly known as "Mark Lee" (unofficial American name).

12.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 of the complaint and, as such, denies them.

13.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the complaint and, as such, denies them.

**JURISDICTION AND VENUE**

14.     The allegations set forth in paragraph 14 of the complaint are legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations set forth in paragraph 14 of the complaint.

15.     The allegations set forth in paragraph 15 of the complaint are legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations set forth in paragraph 15 of the complaint.

16.     The allegations set forth in paragraph 16 of the complaint are legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations set forth in paragraph 16 of the complaint.

**FACTS COMMON TO ALL CLAIMS**

17.     Deny the allegations in paragraph 17 of the complaint.

18.     Deny the allegations in paragraph 18 of the complaint.

19.     Deny the allegations in paragraph 19 of the complaint.

20.     Deny the allegations in paragraph 20 of the complaint.

21.     Deny the allegations in paragraph 21 of the complaint.

22.     Deny the allegations in paragraph 22 of the complaint.

23.     Deny the allegations in paragraph 23 of the complaint.

24.     Deny the allegations in paragraph 24 of the complaint.

25.     Deny the allegations in paragraph 25 of the complaint.

26.     Deny the allegations in paragraph 26 of the complaint.

27.     Deny the allegations in paragraph 27 of the complaint.

28.     Admit the allegations in paragraph 28 of the complaint, except that Defendant Lee's access to Kang's home was limited to the living room area.

29.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 29 of the complaint and, as such, denies them.

30.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 30 of the complaint and, as such, denies them.

31.     Admit only that Plaintiff, through its principal Kang, advised Defendants that it would no longer sell POS software and Keys to Innoas. Except to the extent expressly admitted, Defendants deny the allegations set forth in paragraph 31 of the complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 32 of the complaint and, as such, denies them.

33.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33 of the complaint and, as such, denies them.

34.     Deny the allegations in paragraph 34 of the complaint.

35.     Deny the allegations in paragraph 35 of the complaint.

## **JKSoft's Intellectual Property**

36.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 36 of the complaint and, as such, denies them. To the extent the complaint alleges Plaintiff's ownership of any and all intellectual property in the software he purportedly developed, Defendants deny such allegations.

37.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 37 of the complaint and, as such, denies them.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38 of the complaint and, as such, denies them.

39.     Deny the allegations in paragraph 39 of the complaint.

40.     Admit the allegations in paragraph 40 of the complaint.

41.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 41 of the complaint and, as such, denies them.

42.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 42 of the complaint and, as such, denies them.

43.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43 of the complaint and, as such, denies them.

44.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44 of the complaint and, as such, denies them.

45.     Admit the allegations in paragraph 45 of the complaint.

46.     Deny the allegations in paragraph 46 of the complaint.

47.     Deny the allegations in paragraph 47 of the complaint.

48.     Deny the allegations in paragraph 48 of the complaint.

49.     Deny the allegations in paragraph 49 of the complaint.

50.     Deny the allegations in paragraph 50 of the complaint.

51.     Deny the allegations in paragraph 51 of the complaint.

52.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 52 of the complaint and, as such, denies them.

53.     Deny the allegations in paragraph 53 of the complaint.

54.     Admit only that Plaintiff forwarded a "cease and desist" letters to end-users. Except as expressly admitted, Defendants deny the allegations in paragraph 54 of the complaint.

55.     Admit only that Defendants assert a proprietary interest as co-developers.  Except as expressly admitted, Defendants deny the allegations in paragraph 55 of the complaint.

**FIRST COUNT**

**Copyright Infringement Under 17 U.S.C. §§ 101, 501 *et seq.***

56.     Defendants repeat and re-allege each and every response to paragraphs 1 through 55 of the complaint as if set forth fully herein.

57.     Admit only that the software at issue in this action is copyrightable subject matter pursuant to the Copyright Act. Except as expressly admitted, Defendants deny the allegations in paragraph 57 of the complaint.

58.     Deny the allegations in paragraph 58 of the complaint.

59.     Deny the allegations in paragraph 59 of the complaint.

60.     Deny the allegations in paragraph 60 of the complaint.

61.     Deny the allegations in paragraph 61 of the complaint.

62.     Deny the allegations in paragraph 62 of the complaint.

63.     Deny the allegations in paragraph 63 of the complaint.

64.     Deny the allegations in paragraph 64 of the complaint.

65.     Deny the allegations in paragraph 65 of the complaint.

66.     Deny the allegations in paragraph 66 of the complaint.

**SECOND COUNT**

**Contributory Copyright Infringement Under 17 U.S.C. §§ 501, *et seq.***

67.     Defendants repeat and re-allege each and every response to paragraphs 1 through 66 of the complaint as if set forth fully herein.

68.     Deny the allegations in paragraph 68 of the complaint.

69.     Deny the allegations in paragraph 69 of the complaint.

70.     Deny the allegations in paragraph 70 of the complaint.

71.     Deny the allegations in paragraph 71 of the complaint.

72.     Deny the allegations in paragraph 72 of the complaint.

73.     Deny the allegations in paragraph 73 of the complaint.

74.     Deny the allegations in paragraph 74 of the complaint.

**THIRD COUNT**

**Common Law Trademark Infringement**

75.     Defendants repeat and re-allege each and every response to paragraphs 1 through 74 of the complaint as if set forth fully herein.

76.     Admit only that Plaintiff alleges claims based on Defendants' alleged use of Plaintiff's marks, logos, and product names, etc. Except as expressly admitted, Defendants deny the allegations in paragraph 76 of the complaint.

77.     Deny the allegations in paragraph 77 of the complaint.

78.     Deny the allegations in paragraph 78 of the complaint.

79.     Deny the allegations in paragraph 79 of the complaint.

**FOURTH COUNT**

**State Trademark Dilution (N.J.S.A. § 56:3-13.20 [not -3.20])**

80.     Defendants repeat and re-allege each and every response to paragraphs 1 through 79 of the complaint as if set forth fully herein.

81.     Deny the allegations in paragraph 81 of the complaint.

82.     Deny the allegations in paragraph 82 of the complaint.

83.     Deny the allegations in paragraph 83 of the complaint.

**FIFTH COUNT**

**Violation of the Computer Fraud and Abuse Act under 18 U.S.C. § 1030**

84.     Defendants repeat and re-allege each and every response to paragraphs 1 through 83 of the complaint as if set forth fully herein.

85.     Deny the allegations in paragraph 85 of the complaint.

86.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 86 of the complaint and, as such, denies them.

87.     Deny the allegations in paragraph 87 of the complaint.

88.     The allegations set forth in paragraph 88 of the complaint are legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations set forth in paragraph 88 of the complaint.

89.     Deny the allegations in paragraph 89 of the complaint.

90.     Deny the allegations in paragraph 90 of the complaint.

91.     Deny the allegations in paragraph 91 of the complaint.

92.     The allegations set forth in paragraph 92 of the complaint are legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in paragraph 92 of the complaint.

93.     Deny the allegations in paragraph 93 of the complaint.

94.     Deny the allegations in paragraph 94 of the complaint.

**SIXTH COUNT**

**Violation of the Digital Millennium Copyright Act ("DMCA") under 17 U.S.C. § 1201**

95.     Defendants repeat and re-allege each and every response to paragraphs 1 through 94 of the complaint as if set forth fully herein.

96.     Deny the allegations in paragraph 96 of the complaint.

97.     Deny the allegations in paragraph 97 of the complaint.

98.     Deny the allegations in paragraph 98 of the complaint.

99.     Deny the allegations in paragraph 99 of the complaint.

100.    Deny the allegations in paragraph 100 of the complaint.

101.     Deny the allegations in paragraph 101 of the complaint.

**SEVENTH COUNT**

**Violation of the Federal Defense of Trade Secret Act ("DTSA") under 18 U.S.C. § 1836**

102.     Defendants repeat and re-allege each and every response to paragraphs 1 through 101 of the complaint as if set forth fully herein.

103.     Admit only that the POS software at issue in this matter is used in various states in the United States. Except as expressly admitted, Defendants deny the allegations set forth in paragraph 103 of the complaint.

104.     Deny the allegations in paragraph 104 of the complaint.

105.     Deny the allegations in paragraph 105 of the complaint.

106.     Deny the allegations in paragraph 106 of the complaint.

107.     Deny the allegations in paragraph 107 of the complaint.

**EIGHTH COUNT**

**Statutory Unfair Competition Under N.J.S.A. § 56:4-1, _et seq._**

108.     Defendants repeat and re-allege each and every response to paragraphs 1 through 107 of the complaint as if set forth fully herein.

109.     Deny the allegations in paragraph 109 of the complaint.

110.     Deny the allegations in paragraph 110 of the complaint.

111.     Deny the allegations in paragraph 111 of the complaint.

112.     Deny the allegations in paragraph 112 of the complaint.

113.     Deny the allegations in paragraph 113 of the complaint.

114.     Deny the allegations in paragraph 114 of the complaint.

115.     Deny the allegations in paragraph 115 of the complaint.

116.     Deny the allegations in paragraph 116 of the complaint.

**NINTH COUNT**

**Violation of the Computer Fraud and Abuse Act Under 18 U.S.C. § 1030**

117.    Defendants repeat and re-allege each and every response to paragraphs 1 through 116 of the complaint as if set forth fully herein.

118.    Defendants repeat and re-allege their response provided in paragraph 85 herein.

119.    Defendants repeat and re-allege their response provided in paragraph 86 herein.

120.    Defendants repeat and re-allege their response provided in paragraph 87 herein.

121.    Defendants repeat and re-allege their response provided in paragraph 88 herein.

122.    Defendants repeat and re-allege their response provided in paragraph 89 herein.

123.    Defendants repeat and re-allege their response provided in paragraph 90 herein.

124.    Defendants repeat and re-allege their response provided in paragraph 91 herein.

125.    Defendants repeat and re-allege their response provided in paragraph 92 herein.

126.    Defendants repeat and re-allege their response provided in paragraph 93 herein.

127.    Defendants repeat and re-allege their response provided in paragraph 94 herein.

**TENTH COUNT**

**Common Law Unfair Competition**

128.    Defendants repeat and re-allege each and every response to paragraphs 1 through 127 of the complaint as if set forth fully herein.

129.    Deny the allegations in paragraph 129 of the complaint.

130.    Deny the allegations in paragraph 130 of the complaint.

131.    Deny the allegations in paragraph 131 of the complaint.

132.    Deny the allegations in paragraph 132 of the complaint.

133.    Deny the allegations in paragraph 133 of the complaint.

134.    Deny the allegations in paragraph 134 of the complaint.

135.    Deny the allegations in paragraph 135 of the complaint.

136.    Deny the allegations in paragraph 136 of the complaint.

137.    Deny the allegations in paragraph 137 of the complaint.

## ELEVENTH COUNT

### Tortious Interference With Economic Interest

138.    Defendants repeat and re-allege each and every response to paragraphs 1 through 137 of the complaint as if set forth fully herein.

139.    Deny the allegations in paragraph 139 of the complaint.

140.    Deny the allegations in paragraph 140 of the complaint.

141.    Deny the allegations in paragraph 141 of the complaint.

142.    Deny the allegations in paragraph 142 of the complaint.

143.    Deny the allegations in paragraph 143 of the complaint.

## TWELFTH COUNT

### Conversion

144.    Defendants repeat and re-allege each and every response to paragraphs 1 through 143 of the complaint as if set forth fully herein.

145.    Deny the allegations in paragraph 145 of the complaint.

146.    Deny the allegations in paragraph 146 of the complaint.

147.    Deny the allegations in paragraph 147 of the complaint.

148.    Deny the allegations in paragraph 148 of the complaint.

149.    Deny the allegations in paragraph 149 of the complaint.

**THIRTEENTH COUNT**

**Civil Conspiracy To Defraud**

150. Defendants repeat and re-allege each and every response to paragraphs 1 through 149 of the complaint as if set forth fully herein.

151. Deny the allegations in paragraph 151 of the complaint.

152. Deny the allegations in paragraph 152 of the complaint.

153. Deny the allegations in paragraph 153 of the complaint.

**FOURTEENTH COUNT**

**Unjust Enrichment**

154. Defendants repeat and re-allege each and every response to paragraphs 1 through 153 of the complaint as if set forth fully herein.

155. Deny the allegations in paragraph 155 of the complaint.

156. Deny the allegations in paragraph 156 of the complaint.

157. Deny the allegations in paragraph 157 of the complaint.

158. Deny the allegations in paragraph 158 of the complaint.

159. Admit that the damage caused by Plaintiff's wrongful conduct is incapable of being calculated. Except as expressly admitted, Defendants deny the allegations in paragraph 159 of the complaint.

160. Deny the allegations in paragraph 160 of the complaint.

**FIFTEENTH COUNT**

**Accounting**

161. Defendants repeat and re-allege each and every response to paragraphs 1 through 160 of the complaint as if set forth fully herein.

162. Deny the allegations in paragraph 162 of the complaint.

163.    Deny the allegations in paragraph 163 of the complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to state a claim for which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, under the terms of the parties' agreements because Defendants were acting pursuant to the contract and/or agreements formed between the parties.

### THIRD AFFIRMATIVE DEFENSE

Defendants have proprietary rights in the software alleged in the complaint.

### FOURTH AFFIRMATIVE DEFENSE

Defendants have contractual rights in the software alleged in the complaint.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of equitable estoppel.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' infringement on Plaintiff's rights, if any, were committed in good faith reliance on contracts and/or agreements with Plaintiff and/or in good faith efforts to mitigate the damages caused by Plaintiff's breach thereunder.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because all of Defendants' allegedly wrongful actions were done in good faith and/or in a manner consistent with business necessity.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, under the statute of limitations.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because there is no ascertainable damage, harm, and/or loss sustained by Plaintiff.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' use of Plaintiff's copyrighted works, if any, was fair use.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' use of Plaintiff's trademark, if any, was fair use.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of acquiescence.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' use of Plaintiff's trademark, if any, does not create a likelihood of confusion.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff's allegations of fact are incorrect and are being pled for fraudulent and improper purposes.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, or its recoverable damages should be reduced, because it failed to take reasonable steps to minimize its damages.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the damages suffered by Plaintiff, if any, are caused by Plaintiff's actions or third party actions for which Defendants are not responsible.

## NINTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of *de minimis non curat lex*.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of *injuria absque damno.*

## TWENTY FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because a principal, agent, and/or employee cannot conspire with a corporation he or she serves.

## TWENTY SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants have not been unjustly enriched.

## TWENTY THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff's trademark, if any, is not famous.

## TWENTY FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because its claims are preempted.

### TWENTY FIFTH AFFIRMATIVE DEFENSE

Plaintiff cannot recover twice for the duplicated claims in the Ninth Count of the complaint.

### RESERVATION OF RIGHTS

Defendants reserve and do not waive any additional defenses as may be revealed by information subsequently acquired in discovery or otherwise.

**WHEREFORE,** Defendants demand judgment against Plaintiff:

    a.  Dismissing the complaint in its entirety and with prejudice;

    b.  Awarding Defendants the costs and disbursements of this action; and

    c.  Granting Defendants such other and further relief as the Court deems just and equitable.

### COUNTERCLAIMS AND THIRD PARTY COMPLAINT

Counter-claimants/Third-party Plaintiffs, INNOAS, INC. ("Innoas") and NOAH LEE ("Lee"), by and through their attorneys, Kim, Cho & Lim, LLC, upon personal knowledge as to themselves, and upon information and belief as to other matters, aver against Counter-defendant JKSOFT, INC. and Third-party Defendants, JAE HOON "BRIAN" KANG, XYZ CORPS. 1 through 10 (said names being fictitious); and JOHN/JANE DOES 1 through 10 (said names being fictitious); as follows:

### Preliminary Statement

164.    This matter arises out of a partnership for the development of point-of-sale ("POS") processing software between Third-party Plaintiff, Noah Lee, and Third-party Defendant Brian Kang ("Kang"), who is the principal of Counter-defendant JKSoft, Inc. ("JKSoft").  Subsequent to the formation of their partnership, Kang relocated to the west coast and established his own corporation in California, JKSoft.  Kang and JKSoft are now trying to usurp Innoas and Lee's intellectual property rights, coercing by contacting Innoas and Lee's customers directly, and

disparaging Innoas and its products, with the intention of damaging Innoas's goodwill, or even putting Innoas out of its business.

166. Innoas will suffer irreparable harm if JKSoft and Kang are not preliminarily and permanently enjoined.

166. In addition to restraints, Innoas and Lee primarily seek an accounting, declaratory relief ratifying Innoas and Lee's 50% ownership in the intellectual property rights in the processing software, 100% ownership in the 'look-and-feel' (design aspects) of the same, and recovery of their lost profits and prospective economic advantage.

**The Parties & Jurisdiction**

167. Counter-claimant/Third-party Plaintiff Innoas is a for-profit corporation organized and existing under the laws of New Jersey, with a registered office located at 21 Grand Avenue, Suite 111, in the Borough of Palisades Park, County of Bergen.   INNOAS is the successor corporation since 2012 to ZionLink Inc. ("ZionLink"); and its former subsidiaries First Payment Solutions, Inc. ("1st Payment"), and The 5th Ave USA, Inc. ("5th Ave").

168. Counter-claimant/Third-party Plaintiff Lee is the principal of Innoas, having a principal residence located at 527 Green Valley Road, Paramus, New Jersey 07652. Lee was formerly known as Seung Jai Yi, and also as Mark Lee (Lee's informal American name).

169. Counter-defendant JKSoft is, upon information and belief, a closely held, for-profit corporation organized and existing under the laws of California, with a registered office located at 3429 West Olympic Boulevard, Apartment 502, in the City and County of Los Angeles, State of California.  JKSoft is in the computer software business, more particularly in the POS process software business.

170.     Third-party Defendant Kang is an individual having a principal residence located at 3429 West Olympic Boulevard, Apartment 502, in the City and County of Los Angeles, State of California.   Kang is the Chief Executive Officer, Chief Financial Officer, Secretary and registered agent for JKSoft.

171.     The Third-party Defendants XYZ Corps. 1 through 10 are, upon information and belief, businesses, companies, corporations, limited liability companies or partnerships, traditional partnerships, or other juridical or de facto entities, whose identities are unknown to Innoas and Lee at the current time, but whose may be liable to Innoas and Lee under tort law, contract law, or other statutory or common law, pursuant to the laws of New Jersey, California, or the United States.

172.     The Third-party Defendants, John/Jane Does 1 through 10 are, upon information and belief, individuals, professionals or sole proprietorships whose identities are unknown to Innoas and Lee at the current time, but who may be liable to Innoas and Lee under tort law, contract law, or other statutory or common law, pursuant to the laws of New Jersey, California, or the United States.

173.     Innoas and Lee transacted business within this County and State with JKSoft and Kang.   Innoas and Lee have incurred foreseeable damages and pecuniary damage within this County and State.   Accordingly, jurisdiction and venue are proper in this Court.

### Facts Common to All Counts

174.     Innoas is a leading provider of POS hardware, systems and services, among other 'hi-tech' solutions to a base of merchants such as restaurants, salons, retail stores, and other commercial or professional establishments that accept credit cards.   Innoas has been serving and expanding customer base for about two (2) decades, with an established reputation for responsiveness, high standards for quality and value.   Innoas serves all merchants, with a particular focus on the Korean-language community.

175.    POS systems process credit-card transactions through the services of intermediaries for the 'back-end' processing.  While some credit-card issuers may provide options for direct processing (e.g., American Express), an acquiring or merchant bank generally uses a third-party independent sales organization (ISO) or a membership service provider (MSP) to conduct and monitor the day-to-day activities of their merchant accounts.  ISO's and MSP's have relationships with a VISA or MasterCard Association Member institution (i.e., a bank).  VISA and MasterCard are not banks but "Card Associations" and clearing houses that set standards and interchange fees for their respective brands, and related activities.  Such systems may also provide processing services for other card brands (e.g., Discover, Diners Club) by arrangement.

176.    As such, POS software must process transactions in conjunction with ISO's and MSP's.

177.    Innoas's principal, Lee, began his career in the POS development industry about twenty five (25) years ago.  Kang's history in POS software dates back, upon information and belief, nearly two decades.

178.    Lee met Kang in 2004 when Lee was working at nonparty KOJY Solutions, Inc. ("KOJY"), another POS developer company.  Kang was a shareholder of KOJY at this time.

179.    Thereafter in the same year, Lee conceived of a niche POS market, in particular for small beauty-related businesses such as nail salons.  Lee left KOJY and hired a software developer to create a POS system customized for nail salons.

180.    After about a year, while Lee was dissatisfied with his developer's work, Lee became reacquainted with Kang by happenstance.  Kang explained that he was looking for a new software development project and expressed an interest in working on Lee's POS project.  Kang explained that he cannot develop a software on his own, working only from his home and without

experience in designing and in working in the niche industry, but explained that he can develop one with Lee's contribution and skills.

181.   Lee provided Kang with the source code developed by Lee and the prior software developer.  By 2007, Lee and Kang began selling their new POS software.

182.   Lee and Kang worked jointly in a partnership.  Lee was responsible for designing the look and feel of the interface of the software, suited for and compatible with the nail salon businesses.

183.   Lee, personally and through ZionLink (and later Innoas), was also responsible for the sales, advertisement, and technical supports for the software, as well as sending bug reports, making on-site visits to merchant locations and reporting on any software anomalies or malfunctions.

184.   Kang was solely responsible for developing, updating, and maintaining the software provided, in part, to him by Lee, and to fix faults or 'bugs' that Lee reported.

185.   By 2008, Lee and Kang named their POS product "Beauty Touch$^{TM}$", and sold it to many nail salons.  Customers obtaining a license to use the software were provided with a code or "key" that would unlock its functionality for the period of the license, as is common in software applications of various types.

186.   In the same year, Kang has unilaterally and without consultation with or consent from Lee, registered a domain name for "BeautyTouch.com". To avoid trouble with Kang, Lee began advertising the POS product under an alternate name "ZionBeauty$^{TM}$".

187.   In the meantime, a competitive system began to be offered by a beauty-supply vendor, which was promoted as including an online purchase-order functionality in addition to POS.

188.    After initially planning to invest some $300,000 into Beauty Touch to add this functionality, Lee and Kang decided instead to expand their customer base to include retail enterprises other than nail salons. ZionLink, a corporation then owned by Lee, bid on a food-service version of POS software for a chain of barbecue chicken stores seeking a customized POS software.  ZionLink won the bid, with a $600,000 investment from their clients Phoenix USA, Corp. and its subsidiary Genesis BBQ USA d/b/a BBQ Chicken, but the clients changed the terms and required that ZionLink develop the POS software at its own cost, and give the client-investor an exclusive license to the developed product for a certain number of years. ZionLink agreed to this change of terms.

189.    Pursuant to the contract entered into between ZionLink and Phoenix USA, Corp., Lee and Kang worked continuously for three (3) months to develop the POS software, but the new system still had a number of bugs.

190.    As before, Lee worked with the restaurateurs, and actually worked at restaurants as a cashier, to learn and better develop an appropriate interface and functions for a POS system tailored for restaurant businesses and to identify solutions to common problems in POS systems. As such, Lee authored the "look and feel" of the interface of the POS software including both functional and non-functional aspects of the design, and also worked, through ZionLink (later Innoas), as customer service agent, as well as sales and marketing agent.

191.    Kang again only worked on the writing the source code and installing updates.

192.    They named the resulting product "ZionRestaurant[TM]", after ZionLink, Innoas's predecessor corporation.  This POS software was marketed and installed nationwide in hundreds of restaurant locations. Today, ZionRestaurant[TM] and/or its derivative is marketed and sold under various names including JKRestaurant,

193.    Keys were provided and validated via a POS' Universal Serial Bus (USB) port, typically by a USB flash drive or stick, often called a 'thumb drive'.

194.    Sometime in April of 2008, Lee and Kang reached an oral agreement regarding the terms of their venture.

195.    Sometime in June of 2008, Lee and Kang decided to formalize their joint venture, and signed a contract.  The essential terms of their agreement were:

(a) Lee retained the intellectual property rights to the design and layout (i.e., the "look and feel") of the user interface;

(b) Kang retained the intellectual property rights to the source code; and

(c) Both Lee and Kang had a joint right to the "keys"; that is, both had to approve the issuance or sale of a "key" to a merchant; and

(d) ZionLink and/or other company or companies under Lee's control would be responsible for marketing, and continue to market, the software and pay $200 per key to purchase it from Kang and/or his company;

(e) For any incidental sales made by Kang, Kang could charge $600 for a key, but ZionLink or Lee would not service the merchant;

(f) ZionLink would be bound to purchase POS software from Kang exclusively and prohibited from using or selling the software from third party entities or developing its own software; and

(g) Kang would be responsible for continuously developing the software, at free of cost, and providing it to ZionLink and/or other company or companies under Lee's control.

The original, executed version of that contract is lost and/or destroyed without Innoas (formerly ZionLink) or Lee's fault.

196. About that time, Kang relocated to southern California. On September 29, 2008, Kang established JKSoft under the General Corporation Law of California. Kang also initiated an internet website <www.jksoft.com> to market the software.

197. Lee and Kang continued to operate under the terms of their agreement, notwithstanding Kang's relocation to the west coast, and the establishment of JKSoft. Innoas and Lee retained a number of USB keys.

198. In or about 2009 or 2010, in furtherance and performance of the terms of the parties' agreement, Kang visited ZionLink's office in New Jersey for two or three-day period to have an extensive conference to discuss their POS software development plan. At the conclusion of the conference, Kang handed to Lee a USB containing the source code of the POS software developed thus far, and also containing the key creation program, unlocked and ready for use.

199. In accordance with the terms of the agreement, however, Lee did not make use of the source code or the key creation program; ZionLink, and later Innoas, purchased each key from Kang and/or JKSoft at the agreed upon price of $200 per key.

200. By 2010, ZionLink purchased countless number of keys from Kang or JKSoft and distributed it to its merchant-customers or restaurants at free of cost, collecting fees only for servicing the POS system and providing technical supports, in efforts to collect further information and data on bug reports and improvement on the design and interface of the POS system.

201. Around 2010, Kang determined that the POS software has been developed to the extent that he no longer needs the contribution by Lee or ZionLink in making bug reports and/or

other improvements in the POS software, and began including Kang's own or JKSoft's contact information to draw the end-user's attention to himself.

202.    This had the intended effect of bypassing ZionLink and Lee's role as the distributor. Interested merchants began contacting Kang directly, not ZionLink.

203.    Kang subsequently began marketing the POS software as JKRetail, JKRestaurant, JKSalon and other names associated with JKSoft to these interested merchants. Kang issued and/or sold the POS software to his customers without approval from Lee, in violation of the agreement executed by Lee and Kang.

204.    Kang and JKSoft and/or its purportedly authorized dealers began contacting ZionLink and/or Innoas's merchant-customers directly and offered to provide POS software at a discounted price, thereby inducing Innoas's clients to cease their business with Innoas.

205.    At some time in or about 2013, Lee and Kang exhausted their capital on labor, maintenance, service and bug-correction.  Through 2017, ZionLink and later Innoas invested approximately $1 million in the development of the POS software, formerly known as ZionPOS$^{TM}$, ZionBeauty$^{TM}$, ZionRestaurant$^{TM}$, and other names associated with ZionLink or Innoas, including an estimated $40,000 to $50,000 in developer's fees paid by Lee to Kang.

206.    At present, Innoas (formerly ZionLink) has some 700 to 800 POS systems installed on the east coast.

207.    Around mid-March of 2017, Kang repudiated the agreement reached between Kang and Lee and announced, in effect, that the POS software was his alone.  Kang demanded that Lee cease contacting him by any means except to make offers for purchase of the keys, but refused to sell the keys at the agreed-upon price of $200 any longer.

208.    In mid-December of 2017, Kang began circulating notices to Innoas's merchant-customers, falsely notifying them that the POS software they obtained from Innoas is an illegal copy and demanded them "upgrade" their software, purportedly to protect them from losing access to their POS system when Kang activates a "kill switch" installed on the POS software. In fact, there is no "kill switch" installed on the POS software and Kang only intended to cause fear among Innoas's clients and to deteriorate the relationship between Innoas and its clients.

209.    Around the same time, Kang spontaneously sent a letter to (nonparty) FIDES BANCARD ("FIDES"), a company with which Innoas was embarking on a business partnership. The communication defamed, denigrated and vilified Lee personally, making false statements and disclosing private facts.  The letter also falsely claimed that Innoas's versions of the POS software were illegal, and offered to "legitimize" the illegal copies for $200 each.  Kang also asked FIDES to form an alliance with Kang, and to make Innoas and Lee a common enemy.

210.    FIDES is an ISO for back-end credit-card processing used by Innoas. Lee and the principal of FIDES have a close and constructive working relationship, with the potential to roll out a new venture to process and serve merchants' credit-based POS transactions.

211.    Kang's derogatory letter served no business purpose other than to inflict reputational damage to Innoas and Lee, interfere with Innoas's and Lee's legitimate business interests and contractual relationship with FIDES, create a burden and distraction for Innoas and Lee, and/or coerce Innoas and Lee into paying three-times the agreed rate for a "key" to the POS software Lee had originally conceived and begun to develop.

212.    Also in mid-December 2017, Kang sent Lee an email in a seemingly sociable tone, attaching an old, cordial letter from Kang to Lee, together with some photographs they took

25

together years ago. This facially friendly communication included an offer to allow Lee to pay for each "illegal" copy of POS software at the following rates, using product names Kang devised:

|  | | | |
|---|---|---|---|
| (a) JKRestaurant | 187 X $200/ea. | = $37,400 |
| (b) JKRetail | 33  X $300/ea. | = $ 9,900 |
| (c) JKSalon | 39  X $200/ea | = $ 7,800 |
| Total | | $55,100 |

Still further, Kang's email to Lee also demanded a payment of $8,220 allegedly overdue for purchasing keys, for a total demand of $63,320.

213.   Kang's calculations are manufactured; Kang provides no explanation, and Lee is unaware of, any basis of these numbers and calculation.

214.   Also in mid-December of 2017, JKSoft directly and through its "authorized dealers" including Oh Business Solutions, Inc. a/k/a Ohbis, Inc., wrote and made visits to Innoas's customers. JKSoft falsely advised these merchants they were running "illegal" copies provided by Innoas. JKSoft and/or the principal of Ohbis, Inc. offered to "legitimize" these copies for a payment of $200 per copy to JKSoft.

215.   Also around the same time period, JKSoft contacted Innoas's dealers and agents directly and offered to sell them the POS software and keys at a price lower than those offered by Innoas. After contact by JKSoft, certain dealers and/or agents, have abandoned their relationship with Innoas and began dealing with JKSoft directly. Kang has breached the provisions of the agreement reached between Kang and Lee by selling the POS software to these entities without Lee's approval and at a price lower than that specified in the agreement.

**Need for Judicial Intervention**

216.    Counter-defendant and Third-party Defendants are actively and aggressively campaigning to put Innoas and Lee out of business with misrepresentations and unfair competition, including without limitation, by scaring and threatening Innoas's ISO servicers and merchant-customers about the legality of their software, attempting to extort fees directly from Innoas's customers, attempting to extort tens of thousands of dollars from Innoas to "legitimize" legitimate software copies and for manufactured fees claimed to be overdue, withholding software keys from Innoas unless Kang and JKSoft's demands are met, and besmirching the character of Innoas's management, specifically that of Lee, to its business partners.

217.    Absent the intervention of equity, Innoas and Lee will sustain damage, injury, and/or loss, pecuniary and reputational harm, and otherwise.

**FIRST COUNT**
**Declaratory Relief**
**(Against JKSoft and Kang)**

218.    Counter-claimants and Third-party Plaintiffs ("C&TP-Plaintiffs") repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

219.    There is a present and justiciable controversy between the parties with respect to the ownership and right to control and manage the POS software jointly developed between the parties and marketed by C&TP-Plaintiffs, without limitation to other disputes.

220.    C&TP-Plaintiffs are the lawful owner of the intellectual property rights in the design and interface, the "look and feel" aspect, of the POS software as the author of the same aspect, as per terms of the agreement between the parties, and/or by making contribution to the collective work resulting in the POS software.

221.    Counter-defendant and Third-party Defendants ("C&TP-Defendants") are the lawful owners of the copyright to the source code of the POS software only, subject to C&TP-Plaintiffs' right to the preexisting keys and acquisition of new keys for $200.

222.    C&TP-Plaintiffs changed positions, contributed service, and forewent opportunities to invest in the parties' development of the POS software, including without limitation, extensive field and site investigation to customize and optimize the design, and to identify and resolve bugs, and identify desirable or necessary improvements.

223.    C&TP-Defendants are actively attempting to portray C&TP-Plaintiffs as an illegitimate and corrupt actor, purveying illegal copies of POS software to its customers.

224.    Declaratory relief is appropriate to resolve these controversies.

225.    C&TP-Plaintiffs are entitled to a declaration, without limitation, that (a) C&TP-Plaintiffs are the lawful owner of the design and interface of the POS software; (b) C&TP-Plaintiffs are entitled to sell licenses and rights to POS software using its preexisting keys, and (c) to acquire new keys from C&TP-Defendants for $200 each.

226.    C&TP-Plaintiffs have suffered, and will continue to suffer, irreparable harm as a result of C&TP-Defendants' actions.

227.    A declaration is necessary to prevent irreparable harm to C&TP-Plaintiffs.

## SECOND COUNT
### Injunctive Relief – Restraint on Communications/Defamation
### (Against JKSoft and Kang)

228.    C&TP-Plaintiffs repeats and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

229.    C&TP-Defendants are actively and aggressively campaigning to put C&TP-Plaintiffs out of business with misrepresentations and unfair competition.

230.    C&TP-Defendants are actively and aggressively attempting to scare and threaten C&TP-Plaintiffs' ISO servicers and merchant-customers about the legality of the POS software provided to them by C&TP-Plaintiffs, or C&TP-Plaintiffs' POS software used by them.

231.    C&TP-Defendants are attempting to extort fees directly from C&TP-Plaintiffs' customers to "legitimize" legitimate POS software copies provided by C&TP-Plaintiffs.

232.    C&TP-Defendants are attempting to extort fees directly from C&TP-Plaintiffs to purportedly "legitimize" an already legitimate POS software copies or keys owned by C&TP-Plaintiffs.

233.    C&TP-Defendants are attempting to extort between two (2) to three (3) times the contractual $200 fee from C&TP-Plaintiffs for new POS software copies or keys, and are withholding new keys vital to C&TP-Plaintiffs' business growth.

234.    C&TP-Defendants are falsely and gratuitously defaming C&TP-Plaintiffs' principal in written, unsolicited scare-mail to C&TP-Plaintiffs' ISO.

235.    C&TP-Defendants' actions were taken without consent, right or justification, to position C&TP-Defendants to replace C&TP-Plaintiffs in the POS operations, services, and distributions.

236.    C&TP-Defendants' actions have interfered and continue to interfere with C&TP-Plaintiffs' rights in the parties' POS software.

237.    C&TP-Defendants' actions have interfered and continue to interfere with C&TP-Plaintiffs' ongoing operations, 'growing' its existing business, and development of new business.

238.    C&TP-Plaintiffs have suffered, and will continue to suffer, irreparable harm as a result of C&TP-Defendants' actions.

239.    An injunction is necessary to prevent irreparable injury.

240. The foregoing constitutes a preliminary showing of a reasonable probability of C&TP-Plaintiffs' success on the merits.

241. C&TP-Plaintiffs will suffer greater hardship if an injunction is denied than C&TP-Defendants would suffer if an injunction is granted.

242. Sound public policy favors issuance of an injunction to prevent harm.

243. Alternatively, or in addition, an injunction is warranted to preserve the status quo until the matter can be adjudicated on the merits following discovery.

244. C&TP-Plaintiffs merit an injunction, preliminarily and permanently, restraining and enjoining C&TP-Defendants from direct contacts of any kind with C&TP-Plaintiffs' customers, ISO's or others involved in POS software and credit-card processing.

<div align="center">

**THIRD COUNT**
**Anticipatory Breach**
**(Against JKSoft and Kang)**

</div>

245. C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

246. C&TP-Plaintiffs have acted and continued to contribute funds, labor, services and POS-software talent to the parties' joint POS enterprise.

247. C&TP-Defendants have unilaterally doubled or tripled the parties' agreed-upon price for C&TP-Plaintiffs to acquire new POS software keys.

248. C&TP-Defendants have been circumventing and undermining C&TP-Plaintiffs by communicating directly and falsely with C&TP-Plaintiffs' ISO and customers, to gain improper advantage, thwart or eliminate competition, extort additional and unearned fees, and usurp C&TP-Plaintiffs' rights in the POS software, without limitation.

249.     The foregoing conduct and omissions constitute reasonable grounds to believe that C&TP-Defendants will breach material terms that go to the essence of the parties' POS-related contract, constituting an anticipatory breach.

250.     C&TP-Plaintiffs, as the non-breaching party, may treat the contract as terminated, and may refuse to render continued performance.

251.     C&TP-Plaintiffs are entitled to a declaration that they be relieved of any obligations under the parties' agreement by C&TP-Defendants' breaches.

**FOURTH COUNT**
**Breach of Contract**
**(Against JKSoft and Kang)**

252.     C&TP-Plaintiffs repeat and re-allege all of the foregoing allegations as if set forth at length herein verbatim.

253.     As detailed above, C&TP-Defendants have breached material provisions of the parties' agreement with respect to POS software, installation and maintenance, and pricing, and is improperly tainting and undermining C&TP-Plaintiffs' relationships with its business partners and customers.  Further, C&TP-Defendants are deliberately attempting to frustrate C&TP-Plaintiffs' ability to perform including by, without limitation, unilaterally doubling or tripling the price, withholding keys, and seeking to interfere with requisite services by C&TP-Plaintiffs' ISO.

254.     C&TP-Plaintiffs have fulfilled or exceeded its obligations under the parties' agreement.

255.     As a direct and proximate result of the foregoing breaches, C&TP-Plaintiffs have incurred damage and/or loss.

**FIFTH COUNT**
**Breach of Duty of Good Faith and Fair Dealing**
**(Against JKSoft and Kang)**

256.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

257.     By virtue of entering into an agreement regarding POS software, the parties undertook an obligation of good faith and fair dealing to each other.

258.     Pursuant to the parties' partnership agreement, C&TP-Plaintiffs were obligated to, and did provide funds and performance to C&TP-Defendants, in good faith.

259.     C&TP-Defendants owed the same duty to C&TP-Plaintiffs to act in good faith, so that all parties would enjoy the fruits of their agreement.

260.     Notwithstanding said duty, C&TP-Defendants acted with bad faith, bad motives, deception, evasion, dishonesty, or has engaged in deception or evasion in the performance of the agreement.

261.     C&TP-Defendants' conduct fails to conform to a manner consistent with the reasonable expectations of the parties entering into the partnership agreement, and has denied C&TP-Plaintiffs the benefit of the initially intended bargain with respect to the agreement.

262.     C&TP-Defendants' acts and omissions constitute a breach of the implied covenant of good faith and fair dealing.

263.     As an approximate and direct result, C&TP-Plaintiffs has suffered pecuniary loss, harm, and/or damage, including without limitation, reputational and expectation damages.

**SIXTH COUNT**
**Demand for Accounting**
**(Against JKSoft and Kang)**

264.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

32

265.     C&TP-Defendants has engaged in a pattern of improper acts whereby they have improperly used C&TP-Plaintiffs' rights in the POS software, funds, goodwill and other assets to unlawfully benefit themselves.

266.     C&TP-Plaintiffs have been kept in the dark by C&TP-Defendants as to the true installed base of the POS software and, thus, C&TP-Plaintiffs are not aware of the full extent of the financial abuses, dissipations, diversions or other misuse which C&TP-Defendants may have caused or committed.

267.     By virtue of being a co-owner of the POS software, and sole owner of its design and user interface, C&TP-Plaintiffs are entitled to a full and complete accounting from C&TP-Defendants with respect to C&TP-Defendants' assets and liabilities, revenues and expenses, and other standard financial statements to ascertain the misuses committed by C&TP-Defendants.

268.     C&TP-Plaintiffs are further entitled to a full accounting of Counter-defendant JKSoft's revenues since mid-2013, or such time when C&TP-Defendants began to insert their own contact information into the POS software, and in 2017 or such time when C&TP-Defendants commenced renouncing C&TP-Plaintiffs' rights and role under the parties' agreement.

<u>**SEVENTH COUNT**</u>
**Conversion**
**(Against JKSoft)**

269.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

270.     Counter-defendant JKSoft has wrongfully diverted, taken or used an unknown amount of revenue in which C&TP-Plaintiffs have rights by redirecting customer interest and sale of keys to Counter-defendant, thereby foreclosing C&TP-Plaintiffs' revenue opportunities from hardware installation, maintenance, and customer support, without limitation.

271.    In wrongfully diverting money not for the mutual benefit of the parties, Counter-defendant has acted improperly and wrongfully exercised dominion and control over C&TP-Plaintiffs' revenue.

272.    By wrongfully exercising dominion and control over C&TP-Plaintiffs' revenue, Counter-defendant has improperly converted said funds.

273.    As a direct and approximate result thereof, C&TP-Plaintiffs have suffered damage, loss, and/or control.

<div align="center">

**EIGHTH COUNT**
**Derivative Claim for Breach of Fiduciary Duty Owed to Plaintiff**
**(Against JKSoft and Kang)**

</div>

274.    C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

275.    By operation of law and/or in equity, C&TP-Defendants, as co-owners with effective control over the parties' POS software distribution and activation keys, owe a fiduciary duty to C&TP-Plaintiffs.

276.    C&TP-Defendants breached such duty, without limitation, by deliberately scaring and threatening C&TP-Plaintiffs' ISO servicers and merchant-customers about the legality of their software, attempting to extort fees directly from C&TP-Plaintiffs' customers, attempting to extort tens of thousands of dollars from C&TP-Plaintiffs to purportedly "legitimize" an already-legitimate software copies and for manufactured fees claimed to be overdue, withholding software keys from C&TP-Plaintiffs unless C&TP-Defendants' demands are met, and besmirching the character of C&TP-Plaintiff Innoas's management and C&TP-Plaintiff Lee to their business partners.

277.    C&TP-Defendants have breached such duty as described hereinabove.

278.    As a direct and approximate result thereof, C&TP-Plaintiffs have suffered damage, loss, and/or control.

### NINTH COUNT
### Negligent Misrepresentation
### (Against JKSoft and Kang)

279.    C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

280.    C&TP-Plaintiffs and C&TP-Defendants have a special, privity-like relationship as co-owners of the POS software and, as a result of that relationship, C&TP-Defendants had a duty to impart true and accurate information to C&TP-Plaintiffs regarding the POS product and Counter-defendant JKSoft, its assets, business, expenses, revenue and any indebtedness, contemplated or current.

281.    C&TP-Defendants breached their duty to C&TP-Plaintiffs commencing in or about 2013 when C&TP-Defendants began to insert their contact information into C&TP-Plaintiffs' display and interface, thereby diverting potential business from C&TP-Plaintiffs to C&TP-Defendants.  C&TP-Defendants had, at a minimum, a duty to advise C&TP-Plaintiffs of such material change in the operation of the POS software, but remained silent in face of that duty.

282.    C&TP-Defendants breached their duty to C&TP-Plaintiffs when they negligently made representations and provided information alleging unlawful keys, demanding "legitimation" fees for legitimate software copies totaling over $55,000, plus 'overdue' key-fees that C&TP-Defendants knew be untrue.

283.    C&TP-Defendants knew or reasonably should have known that C&TP-Plaintiffs would rely on these representations or omissions in the contribution and performance of C&TP-Plaintiffs' funds and services to the joint enterprise.

284.     C&TP-Defendants failed to take adequate steps to make or supply further, accurate information to regarding the representations and omissions, with an intent to induce C&TP-Plaintiffs' continued contribution of funds, labor, management and skill.

285.     C&TP-Plaintiffs reasonably relied on C&TP-Defendants' representations and omissions until such time as C&TP-Defendants' efforts to overcharge, undermine, and generally put C&TP-Plaintiffs out of business came to C&TP-Plaintiffs' attention.

286.     C&TP-Plaintiffs have been damaged by C&TP-Defendants' negligent misrepresentations and omissions.

<div align="center">

**TENTH COUNT**
**Legal Fraud**
**(Against JKSoft and Kang)**

</div>

287.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

288.     C&TP-Defendants desired and needed C&TP-Plaintiffs' knowledge and experience with POS systems, and real-world merchant requirements, to supplement Kang's knowledge and skill in software development with additional information such as the optimal design, look and feel, interface, and functions to be inserted into the POS software.

289.     C&TP-Defendants represented that C&TP-Plaintiffs will retain certain rights in the intellectual property in the POS software, including but not limited to 100% ownership in the design aspect of the same and a discounted price for the purchase of the key.

290.     C&TP-Defendants' representations and omissions were knowingly false when made.  C&TP-Defendants asserted these representations and omissions with scienter.

291.     C&TP-Plaintiffs reasonably relied on C&TP-Defendants' representations and omissions until such until such time as C&TP-Defendants' efforts to overcharge, undermine, and generally put C&TP-Plaintiffs out of business came to C&TP-Plaintiffs' attention.

292.    C&TP-Plaintiffs have been damaged by C&TP-Defendants' misrepresentations and omissions.

### ELEVENTH COUNT
### Unjust Enrichment
### (Against JKSoft)

293.    C&TP-Plaintiffs repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

294.    Counter-defendant JKSoft misdirected merchant contacts, activation fees and servicing revenues from C&TP-Plaintiffs to JKSoft for its use and gain.

295.    Counter-defendant JKSoft's unilaterally inflated fees demanded from C&TP-Plaintiffs customers bypassed C&TP-Plaintiffs to JKSoft for its use and gain.

296.    Counter-defendant JKSoft's retention of these unlawful gains, and the continuing diversion of funds, and charging of false and inflated fees has caused C&TP-Plaintiffs to suffer pecuniary loss, damage, and harm.

297.    In so doing, Counter-defendant JKSoft has been unjustly enriched at C&TP-Plaintiffs' expense.

### TWELFTH COUNT
### Disgorgement
### (Against JKSoft and Kang)

298.    C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

299.    C&TP-Defendants' aforedescribed wrongful conduct has resulted in their unjust enrichment, to the detriment of C&TP-Plaintiffs.

300.    C&TP-Defendants should not be permitted to retain any funds that were diverted or wrongly charged, as to do so would be to reward C&TP-Defendants' unlawful behavior. C&TP-Defendants should be compelled to disgorge all such diverted and other funds gained and/or used,

and remit them to C&TP-Plaintiffs, less any legitimate disbursements due to Counter-defendant

JKSoft, if any, together with costs and lawful interest.

301.     C&TP-Defendants should be stripped of wrongful gains by the diversion of C&TP-

Plaintiffs' assets and the breach of their agreement with C&TP-Plaintiffs, and be required to

disgorge the funds wrongfully retained, and tender them to C&TP-Plaintiffs, together with costs

and lawful interest.

<div align="center">

**THIRTEENTH COUNT**
**Trade Libel/Disparagement**
**(Against JKSoft and Kang)**

</div>

302.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as

though fully set forth at length herein verbatim.

303.     In mid-December of 2017, C&TP-Defendants knowingly, willfully, and with

malice, published a letter to FIDES, to defame, denigrate and vilify C&TP-Plaintiff Innoas with

false allegations concerning C&TP-Plaintiff Innoas' property, product, practice, business.

304.     C&TP-Defendants' letter to FIDES also libeled C&TP-Plaintiff Lee personally.

305.     C&TP-Defendants asked FIDES to form an alliance amongst themselves, instead

dealing with a loathsome person such as Lee, a "common enemy" (or words to that effect).

306.     The letter also falsely disparaged C&TP-Plaintiffs' POS software as being illegal,

wrongly seeking compensation of $200 for each copy to "legitimize" it.

307.     C&TP-Plaintiffs' POS services depends on the credit-card processing services and

trust of ISO's/MSP's such as FIDES to conduct its business.

308.     In the case of FIDES, C&TP-Plaintiffs and FIDES were contemplating a new

venture, a potential roll out of a new company to process and serve merchants' credit-based POS

transactions.

309.   At or about the same time, C&TP-Defendants knowingly, willfully, and with malice, published a letter directly to a number of merchants who are or were C&TP-Plaintiffs' customers, also making false allegations concerning C&TP-Plaintiffs' property, product or business.

310.   C&TP-Defendants' letter to C&TP-Plaintiffs' customers, or some customers, falsely claimed that C&TP-Plaintiffs had provided them with illegal copies of POS software, and offered to "legitimize" their copies for a fee of $200 per copy.

311.   C&TP-Defendants' defamatory letters were communicated to third parties.

312.   C&TP-Defendants' letters contained maliciously false allegations.

313.   C&TP-Defendants' letters served no legitimate business purpose.

314.   C&TP-Defendants' letters were of a kind designed to prevent others from dealing or associating with C&TP-Plaintiffs, or otherwise to interfere with C&TP-Plaintiffs' relations with others, and to lower their reputation in the estimation of the community, in particular the retail and Korean-speaking communities.

315.   C&TP-Plaintiffs has suffered loss and damage as a result of C&TP-Defendants' libelous publications.

**FOURTEENTH COUNT**
**Violation of N.J. Fair Trade Act, N.J.S.A. § 56:4–1, *et seq.***
**(Against JKSoft and Kang)**

316.   C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

317.   C&TP-Defendants' December 2017 letters to FIDES and C&TP-Plaintiffs' customers included solicitations for business.

318.   C&TP-Defendants' December 2017 letters to FIDES and C&TP-Plaintiffs' customers constituted advertising.

319.   In said letters C&TP-Defendants directly made, and/or acted in concert to make, false or misleading statements that are likely to cause confusion as to the legality of the POS software installed or provided by C&TP-Plaintiffs, in contrast to the alleged legality of C&TP-Defendants' POS software.

320.   C&TP-Defendants' advertising was knowingly and willfully made, with the intent to confuse C&TP-Plaintiffs' ISO and customers with regard as to the source of lawful POS software.

321.   C&TP-Defendants' aforesaid communications contained false or misleading statements as to C&TP-Defendants' own product and C&TP-Plaintiffs' product.

322.   C&TP-Defendants' communications contain actual deception and/or at least a tendency to deceive a substantial portion of the intended audience; i.e., C&TP-Plaintiffs' ISO and merchant-customer base.

323.   C&TP-Defendants' said deception is material in that it is likely to influence the audience's business and purchasing decisions.

324.   C&TP-Defendants' and C&TP-Plaintiffs' POS software traveled in interstate commerce, including without limitation within New Jersey.

325.   As a result of C&TP-Defendants' communications, there is a likelihood of injury to C&TP-Plaintiffs in terms of loss or limitation of access to credit-card clearing services, and/or declining sales, loss of good will, and reputational injury in the business and Korean-speaking communities.

**FIFTEENTH COUNT**
**Common Law Unfair Competition**
**(Against JKSoft and Kang)**

326.   C&TP-Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein verbatim.

40

327.     C&TP-Defendants' misrepresentation of the legality of C&TP-Plaintiffs' products and services, and/or C&TP-Defendants' publication of defamatory and disparaging claims, and/or disclosure of private and confidential information, violate fair play.

328.     The information regarding the individuals and/or entities to which the misrepresentations, publications, and/or disclosures were disseminated were obtained from C&TP-Plaintiffs' proprietary and confidential information disclosed to C&TP-Defendants for business purposes.

329.     C&TP-Defendants' aforesaid actions and publications constitute common law unfair competition.

330.     As a direct and proximate result of C&TP-Defendants' unfair competition, C&TP-Plaintiffs have been, and is likely to continue to be damaged.

331.     An injunction is necessary to prevent irreparable injury to C&TP-Plaintiffs.

## SIXTEENTH COUNT
### Tortious Interference With Business Relationships/Prospective Economic Advantage
### (Against JKSoft And Kang)

332.     C&TP-Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein verbatim.

333.     C&TP-Plaintiffs have contractual relationships with its ISOs/MSPs, customers and merchants who process or use C&TP-Plaintiffs' equipment, services and software.

334.     Some of these relationships are existing and C&TP-Plaintiffs are pursuing other business opportunities using the experience, knowledge and reputation gained from its equipment, services and software.

335.     C&TP-Plaintiffs have a reasonable expectation of economic advantage in these relations.

336.     C&TP-Defendants, as C&TP-Plaintiffs' developer in the POS software products, had knowledge of C&TP-Plaintiffs' contractual relationships.

337.     C&TP-Defendants, acting in competition with, had actual knowledge of the contractual relationships between C&TP-Plaintiffs and C&TP-Plaintiffs' ISOs/MSPs, customers and merchants, as well as of the significance of C&TP-Plaintiffs' goodwill and reputation.

338.     C&TP-Defendants interfered with C&TP-Plaintiffs' contractual relationships in order to divert  revenue from C&TP-Plaintiffs; undercut and/or eliminate C&TP-Plaintiffs' business with C&TP-Plaintiffs' ISOs/MSPs, customers and merchants; inflate C&TP-Plaintiffs' cost of doing business, including without limitation by dedicating significant resources to the refuting C&TP-Defendants' accusations and demands for payment to purportedly "legitimize" an already-legitimate software provided, installed and maintained by C&TP-Plaintiffs; damage C&TP-Plaintiffs' good name and reputation; and ultimately put C&TP-Plaintiffs out of business or replace C&TP-Plaintiffs with Counter-defendant JKSoft or a related entity as the supplier of C&TP-Plaintiffs' equipment, services and software.

339.     C&TP-Defendants induced or otherwise sought to cause C&TP-Plaintiffs' ISOs/MSPs, customers and merchants to breach their various contractual duties with C&TP-Plaintiffs.

340.     C&TP-Defendants' conduct was intentional.

341.     C&TP-Defendants have so acted intentionally and with malice, and have engaged in such conduct that is wrongful and without justification or excuse.

342.     In absence of C&TP-Defendants' interference, there was a reasonable probability that C&TP-Plaintiff would have continued its contractual relationship with its ISOs/MSPs, customers and merchants and would have received the anticipated economic benefit.

343.     As a direct and proximate result of such interference, C&TP-Plaintiffs have been and is likely to continue to be damaged.

344.     C&TP-Defendants are liable for C&TP-Plaintiffs' damages.

<div align="center">

**SEVENTEENTH COUNT**
**Tortious Interference with Contract**
**(Against JKSoft And Kang)**

</div>

345.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein.

346.     C&TP-Defendants are not rightfully parties to, or authorized to act on behalf of, C&TP-Plaintiffs with respect to C&TP-Plaintiffs' ISOs/MSPs, customers and merchants contracts with C&TP-Plaintiffs, or any other contracts.

347.     C&TP-Defendants intentionally and without justification or excuse unreasonably and actually interfered with these agreements and contracts.

348.     As a direct and proximate result of C&TP-Defendants' interferences, C&TP-Plaintiffs have been damaged.

349.     As a direct and proximate result of such interference, C&TP-Plaintiffs have been and is likely to continue to be damaged.

350.     C&TP-Defendants are liable for C&TP-Plaintiffs damages.

<div align="center">

**EIGHTEENTH COUNT**
**Misappropriation of Trade Secret**
**(Against JKSoft and Kang)**

</div>

351.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

352.     The business information of C&TP-Plaintiffs, including but not limited to the list and information of its clients, vendors, and suppliers, are protectable trade secret.

353.     C&TP-Plaintiffs' trade secret was entrusted with, and disclosed in confidence to, C&TP-Defendants.

354.     C&TP-Plaintiffs took precautions to maintain the secrecy of its trade secret, but its trade secret had to be disclosed to C&TP-Defendants by the nature of the parties' relationship and by the operation of the key registration mechanism C&TP-Defendants installed in each copy of POS software.

355.     In breach of the confidence, C&TP-Defendants made use of C&TP-Plaintiffs' trade secret to directly and/or indirectly contact C&TP-Plaintiffs' customers and merchants and solicit business from them or disseminate defamatory information to them.

356.     Such use of C&TP-Plaintiffs' trade secret in breach of confidence was to the detriment of C&TP-Plaintiffs, including but not limited to loss of contracts with customers and merchants.

357.     As a direct and proximate result of such misappropriation of trade secret, C&TP-Plaintiffs have been and is likely to continue to be damaged.

358.     C&TP-Defendants are liable for C&TP-Plaintiffs damages.

**NINETEENTH COUNT**
**Invasion of Privacy**
**(Against JKSoft and Kang)**

359.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

360.     C&TP-Defendants' December 2017 letter to nonparty FIDES disseminated private information regarding C&TP-Plaintiff Lee of such a nature that would be offensive to a reasonable person.

361.     The information disseminated by C&TP-Defendants was not in the public domain.

362.     C&TP-Defendants had no legitimate interest in publicly apprising a third party of the information being publicized.

363.     C&TP-Defendants' December 2017 letter to nonparty FIDES constitutes an unreasonable publication of private facts, without regard to their falsity or truthfulness.

364.     C&TP-Defendants' letter was intended to inflict reputational damage to C&TP-Plaintiffs.

365.     As a direct and proximate result of C&TP-Defendants' invasion of the privacy of C&TP-Plaintiff Lee, C&TP-Plaintiffs have been, and is likely to continue to be damaged.

366.     C&TP-Defendants are liable for C&TP-Plaintiffs damages.

**TWENTIETH COUNT**
**Copyright Infringement**
**(Against JKSoft and Kang)**

367.     C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

368.     The designs of the interface, or the "look and feel" aspect, of the POS software at issue are original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.*

369.     The designs of the interface, or the "look and feel" aspect, of the POS software at issue are copyrightable subject matter separate and independent from the source code and/or object code underlying the software.

370.     C&TP-Plaintiff Lee was the user interface designer and the author of the design and "look and feel" of the POS software.

371.     By being the author, and pursuant to 17 U.S.C. § 201, C&TP-Plaintiff Lee was the owner of the copyright to the design and "look and feel" since the fixation of the same onto the POS software, and still is the owner of the same.

372.    In or about June 2008, Lee granted Kang and his company a conditional license to use and reproduce Lee's copyrighted material.

373.    The conditions, among others, were as follows:

    a.  All issuance or sales of the POS software had to approved by both Lee and Kang;

    b.  ZionLink and/or other company or companies under Lee's control would be responsible for marketing, and continue to market, the software and pay $200 per key to purchase it from Kang and/or his company;

    c.  For any incidental sales made by Kang, Kang could charge $600 for a key (embodying the POS software), but ZionLink or Lee would not service the merchant; and

    d.  Kang would be responsible for continuously developing the software, at free of cost, and providing it to ZionLink and/or other company or companies under Lee's control.

374.    In breach of the terms of the licensing contract between the parties, Kang, personally and through his corporation JKSoft, sold the POS software to other entities without Lee's consent.

375.    In breach of the terms of the licensing contract between the parties, Kang sold the POS software to other entities at prices lower than $600.

376.    In breach of the terms of the licensing contract between the parties, Kang declared that he will cease to sell to Lee or his company, Innoas, the POS software at the agreed upon $200 price.

377.    In breach of the terms of the licensing contract between the parties, Kang ceased providing developments, updates, and/or bug-fixes to the POS software.

378.    By breaching the terms of the licensing contract, Kang exceeded his rights under the copyright licensing contract and infringed on Lee's copyright in the design and "look and feel" of the POS software.

379.    In the alternative, in absence of any agreement, Kang infringed on Lee's copyright by copying, reproducing, and distributing Lee's copyrighted materials without Lee's approval or consent.

380.    Kang's infringement on Lee's copyright was and is willful, deliberate, knowing, intentional, and malicious and, at a minimum, Kang acted with willful blindness to, and/or in reckless disregard of, Lee's copyrights.

381.    As a result of Kang's infringement of Lee's copyright, Lee and Innoas (formerly ZionLink) have been, is currently being, and will continue to be, damaged.

382.    Lee is entitled to recover damages, including but not limited to: any and all profits Kang and/or JKSoft derived by their infringement on Lee's copyright; actual damages and statutory damages under 17 U.S.C. § 504, and attorney's fees and costs of suit under 17 U.S.C. § 505.

383.    Lee is also entitled to injunctive relief pursuant to 17 U.S.C. § 502 and to an order impounding any and all infringing materials pursuant to 17 U.S.C. § 503. Lee has no adequate remedy at law for Kang and JKSoft's wrongful conduct. Lee's copyrights are unique and valuable property which has no readily determinable market value. Kang and JKSoft's infringement harms C&TP-Plaintiffs such that C&TP-Plaintiffs cannot be made whole solely by monetary award. Furthermore, Kang and JKSoft's wrongful conduct, and the resulting damages to C&TP-Plaintiffs are continuing.

**TWENTY FIRST COUNT**
**Vicarious and Contributory Copyright Infringement**
**(Against JKSoft and Kang)**

384.    C&TP-Plaintiffs repeat and reallege the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

385.    Kang and JKSoft issues, sold, and/or otherwise distributed the POS software, containing materials subject to Lee's copyright, to entities other than Innoas.

386.    Such issuance, sale, and/or distributions were not consented or approved by Lee.

387.    As such, such issuance, sale, and/or distributions were in breach of the copyright licensing contract between Lee and Kang, and constituted an infringement on Lee's copyright.

388.    Any uses or copying of the POS software and the design or "look and feel" of the POS software by the entities purchasing and/or receiving the POS software from Kang and JKSoft in breach of the licensing contract also constitute an infringement on Lee's copyright.

389.    In the alternative, in absence of any agreement, any uses or copying of the POS software and the design or "look and feel" of the POS software by the entities purchasing and/or receiving the POS software from Kang and JKSoft without authorization, approval, and/or consent by Lee also constitute an infringement on Lee's copyright.

390.    These entities, as well as Kang and JKSoft, are the primary infringers of Lee's copyright.

391.    Kang and JKSoft had the right and ability to supervise and/or control the use and/or copying of Lee's copyrighted materials by the primary infringers.

392.    Kang and JKSoft had financial interest, and derived profit from, inducing and/or causing the primary infringers to purchase and infringe on Lee's copyright.

393.    As such, Kang and JKSoft are vicariously liable for the primary infringers' infringement on Lee's copyright.

394.    Kang and JKSoft knew, should have known, or was willfully blind of, the primary infringers' infringement on Lee's copyright.

395.    Kang and JKSoft contributed to the primary infringers' infringement of Lee's copyright by issuing, selling, and/or otherwise distributing the POS software to the primary infringers.

396.    As such, Kang and JKSoft are contributorily liable for the primary infringers' infringement on Lee's copyright.

397.     C&TP-Plaintiff Lee suffered, is suffering, and will continue to suffer, harm and damages in an amount to be determined throughout discovery and at trial.

398.    C&TP-Plaintiff Lee is entitled to monetary and injunctive reliefs set forth in 17 U.S.C. §§ 502 through 505.

## PRAYER FOR RELIEF

**WHEREFORE**, Counter-claimants and Third-party Plaintiffs, INNOAS, INC. and NOAH LEE, seek judgment against the Counter-defendant JKSoft, Inc. and Third-party Defendant Jae Hoon ("Brian") Kang, as follows:

a)    declaring C&TP-Plaintiffs as co-owner of the parties' Point-of-Sale software;

b)    declaring C&TP-Plaintiffs as sole owner of the design and interface of the parties' Point-of-Sale software;

c)    declaring C&TP-Plaintiffs' installed base of POS software to be "legal" copies;

d)    restraining and enjoining C&TP-Defendants from communicating directly or indirectly with C&TP-Plaintiffs' third-party credit-card independent sales organizations (ISOs) or membership service providers (MSPs) regarding C&TP-Plaintiffs' business, products or services, including without limitation, the legality thereof;

e)      directing C&TP-Defendants to publish a retraction to C&TP-Plaintiffs'
ISO(s)/MSP(s), and to C&TP-Plaintiffs' customers and merchants regarding the
legality of its/their copies of, or "keys" to, C&TP-Plaintiffs' POS software, and
further regarding C&TP-Defendants' demand to the foregoing for compensation to
"legitimize" the same;

f)      restraining and enjoining C&TP-Defendants from communicating directly or
indirectly with C&TP-Plaintiffs' ISO(s)/MSP(s), customers and merchants, other
than said retraction;

g)      directing C&TP-Defendants to have an audited accounting prepared and served
upon C&TP-Plaintiffs indicating with specificity:

(i)     the installed base of all C&TP-Defendants' POS software;

(ii)    the revenues for same since not less than six (6) years prior to the filing of this
action; and

(iii)   the quantum of funds obtained or diverted by or on behalf of C&TP-Defendants;

h)      compelling C&TP-Defendants to disgorge to C&TP-Plaintiffs all such funds
obtained or diverted funds by such accounting;

i)      awarding C&TP-Plaintiffs compensatory, consequential, incidental, expectation,
and exemplary damages, including pre-judgment and post-judgment interest;

j)      declaring that C&TP-Defendants have primarily and/or directly infringed on Lee's
copyright;

k)      declaring that C&TP-Defendants have secondarily and/or vicariously infringed on
Lee's copyright;

l)    declaring that C&TP-Defendants have secondarily and/or contributorily infringed on Lee's copyright;

m)    awarding C&TP-Plaintiffs monetary and injunctive relief as provided in 17 U.S.C. §§ 502 through 505, including actual damages, profits by C&TP-Defendants, statutory damages, attorneys' fees, and cost of suit;

n)    awarding C&TP-Plaintiffs reasonable attorneys' fees, other litigation expenses and costs of suit; and

o)    holding C&TP-Defendants jointly and severally liable for C&TP-Plaintiffs' damages to be awarded;

p)    awarding such other, further or different relief as the Court may deem equitable, just and fair.

<div align="center">

**<u>JURY DEMAND</u>**

</div>

Pursuant to Fed. R. Civ. P. 38(b) and L.Civ. R. 38.1, Defendants, Counter-claimants, and Third-Party Plaintiffs, INNOAS, INC. and NOAH LEE, hereby demand a trial by jury as to all issues so triable.

## CERTIFICATION PURSUANT TO L.Civ. R. 11.2

The matter in controversy is not the subject of any other action known to be pending in any court, or of any pending arbitration or administrative proceeding.

Pursuant to 28 U.S.C. § 1746(2), I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2018.

<div style="margin-left:40%;">

**KIM, CHO & LIM, LLC**
*Attorneys for Defendants/Counter-claimants and Third-Party Plaintffs*

**By:**   /s/ *Joshua S. Lim*
**JOSHUA S. LIM, ESQ.**
460 Bergen Boulevard, Suite 305
Palisades Park, NJ 07650
Tel: (201) 585-7400
Fax: (201) 585-7422
joshualim@kcllawfirm.com

</div>